IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ELVEN JOE SWISHER and WALTER O. LINDSEY, <br><br> Plaintiffs, <br><br><br> vs. <br><br><br> K. E. COLLINS, et al., <br><br> Defendants. | ORDER <br><br> AND <br><br> MEMORANDUM DECISION <br><br><br> Case No. CV 06-338-S-BLW |

The myriad events that ultimately led to this civil litigation began when *pro se* Plaintiff Elven Joe Swisher made certain representations about his past military service on an application for increased disability benefits from the Veterans Administration and during testimony as a material government witness at a "murder for hire" trial. *Pro se* Plaintiff Walter O. Lindsey got involved when he assisted Mr. Swisher with complaints from fellow Marine Corps League members that Mr. Swisher was wearing military decorations he had not earned.

The two men contend they have been damaged by defamatory statements and other wrongs resulting from an investigation prompted by the disability benefit application and Mr. Swisher's trial testimony. In particular, Mr. Swisher alleges claims against four federal agencies for violations of the Privacy Act. In the same complaint, Mr. Swisher and Mr. Lindsey allege claims against various entities and individuals for defamation and breach of contract.

This matter comes before the court on five motions for summary judgment[1] filed by the remaining defendants on all remaining claims:  (1) the Federal Agency Defendants' Motion for Summary Judgment on the Privacy Act claims;[2]  (2) the Motion for Summary Judgment filed by Defendants Patrick Teague and Steven Teague (employees of the Idaho Division of Veterans Services) on the defamation claims brought against them in their individual capacities;[3] (3) Defendant Wesley Hoyt's Motion for Summary Judgment on the defamation claim against him;[4]  (4) the Idaho Observer Defendants' Motion for Summary Judgment on the defamation claims;[5]  and (5) the National Marine Corps League Defendants' Motion for Summary Judgment on defamation and breach of contract claims (in which the Teague Defendants join).[6]

For the reasons set forth below, the court GRANTS all of the Defendants' motions for summary judgment and DENIES Plaintiffs' Motions to Deny the motions for summary judgment.

---

[1]Mr. Swisher filed five pleadings titled "Motion to Deny" each of the five motions for summary judgment, but given the nature of those five pleadings, they are more appropriately characterized as opposition briefs, and the court treats them as such.  The other *pro se* Plaintiff, Walter Lindsey, did not file separate pleadings in response to the motions for summary judgment. But because Mr. Swisher's pleadings sometimes contain Mr. Lindsey's signature (each is identified below), the court will consider those signed pleadings to be Mr. Lindsey's opposition papers.

[2]Docket No. 200.

[3]Docket No. 222.

[4]Docket No. 215.

[5]Docket No. 220.

[6]Docket Nos. 225, 227.

## I.  FACTUAL BACKGROUND[7]

*Pro se* Plaintiff Elven Joe Swisher is a disabled American veteran and former United States Marine who was a member of the federally-chartered National Marine Corps League ("League"), including the League's "detachment" in Lewiston, Idaho ("the Sgt. Maj. Linehan Detachment" or "Lewiston Detachment").  (The League, although federally-chartered, is not a government agency or part of the military.)  *Pro se* Plaintiff Walter Lindsey is a veteran who served as Commandant of the Lewiston Detachment when Mr. Swisher was a member.

This case arises out of three central events: (1) Mr. Swisher's application for increased disability benefits from the Veterans' Administration ("VA"); (2) Mr. Swisher's testimony as a material witness for the federal government at a "murder for hire" trial in Idaho (see United States v. David Hinkson, Case No. CR-04-127-RCT (D. Idaho)); and (3) subsequent investigations and actions taken by various entities and individuals (including the VA and the League) upon receiving allegations that Mr. Swisher committed fraud and perjury concerning his military record.

### A.    Idaho Division of Veterans Services' Assistance to Swisher in Obtaining VA Benefits

On December 21, 2000, Mr. Swisher filled out and signed VA Form 21-22 titled "Appointment of Veterans Service Organization as Claimant's Representative."  (Ex. A attached to Decl. of Patrick D. Teague (Dkt # 222-4).)  The appointment form authorized "the Department of Veterans Affairs to release any and all of my records . . . to that service organization appointed

---

[7]Although Plaintiffs submit sworn statements and documents in opposition to the motions for summary judgment, their evidence either does not dispute material facts or is inadmissible, as will be noted throughout this order.  For these reasons, the court finds that there are no genuine issues of material fact.

as my representative." (Id.)  In that form, Mr. Swisher appointed Veterans of Foreign Wars

(VFW) as his representative "to prepare, present and prosecute [his] claim for any and all

benefits from the Department of Veterans Affairs." (Id.)  Because VFW had already appointed

the Idaho Division of Veterans Services (IDVS) Office of Veterans Advocacy as veterans

services officers to represent its members, Mr. Swisher was represented by IDVS employees.

(On June 23, 2005, Mr. Swisher revoked the appointment.)

IDVS veterans services officers have a broad range of duties,[8] including staffing veterans

services offices and meeting with veterans who come to those offices seeking information or

assistance; meeting with veterans at the VA hospital, Idaho State Veterans Home or in other

locations; attending meetings or conventions held or sponsored by veterans organizations, service

clubs, government organizations, the Red Cross, and others to meet with veterans; making

presentations to veterans and others concerning veterans benefits or programs available to assist

veterans; and representing individual veterans before the Veterans Benefit Administration within

the VA to obtain benefits.   Performing these duties requires that the officers be available not

only to meet during regular office hours but also to travel to and be on duty at irregular hours in

locations throughout the state of Idaho (depending on the times and places at which meetings or

conventions are held).  At these meetings and conventions, the officers provide assistance or

information concerning the veterans' needs to veterans and their families.

During Mr. Swisher's appointment of VFW/IDVS, Ben Keeley (an IDVS employee and

---

[8]A veterans services officer must be accredited by the VA before he can represent
veterans before the Veterans Benefits administration and receive information concerning the
veteran from the VA.

veterans services officer) assisted Mr. Swisher with his application to obtain increased benefits from the VA.  As part of the application, Mr. Keeley submitted two documents provided to him by Mr. Swisher:  a "replacement DD-214 form"[9] and a letter seemingly from Captain W. J. Woodring, Jr. (the "Woodring Letter"), who had signed Mr. Swisher's original discharge (DD-214) form in 1957.

The Replacement DD-214 Form stated that Mr. Swisher had been awarded the "Silver Star, Navy and Marine Corps Medal W/Gold Star, Purple Heart, Navy and Marine Corps Commendation Medal W/Bronze 'V'." (Dkt # 210-5 at 5.)  It also stated that he had been wounded in September 1955 in Korea by "multiple shrapnel and gunshot." (Id.)  Near the bottom of the form, the following was typewritten: "This document replaces the previously issued transfer document of 8-3-57.  Changes and additions have been verified by Command. The original of this DD 214 has been forwarded to headquarters MC (10-15-57). . . . Entitled to wear Marine Corps Expeditionary Medal." (Id.)  Below that was what appeared to be the signature of "W. J. Woodring, Jr., Capt., USMC." (Id.)

The accompanying Woodring Letter, dated October 16, 1957, stated that "I am pleased to inform you that your combat action, awards and citations have been verified.  A copy of a replacement DD 214 transfer document, which more accurately reflects your military service, is attached to this correspondence.  The original has been forwarded to the Commandant of the Marine Corps at Headquarters Marine Corps in Washington, D. C." (Dkt # 210-5 at 11.)

With the above listed documents, Mr. Swisher obtained increased benefits for his

_____

[9]The "DD Form 214" is the Department of Defense's Certificate of Release or Discharge from Active Duty.  (See Ex. B to Decl. of Patrick Teague.)

disability, which he claimed was due to the multiple wounds he allegedly incurred in combat. (See Sep. 10, 2004 Letter from Swisher to Keeley, attached as Ex. B to P. Teague Decl.)  But his success was temporary.

A few months later, in January 2005, Mr. Keeley sent information to his colleague Defendant Patrick Teague (Acting Administrator and Veterans Services Program Supervisor at IDVS), seeking guidance on how to proceed with Mr. Swisher's case, apparently because he believed that "fraud is overwhelming in this whole thing [i.e., Mr. Swisher's VA disability benefit application]."  (P. Teague Decl. ¶ 17 & Ex. B)  Mr. Keeley based his statement in large part on a December 30, 2004 letter he received from Lieutenant Colonel K. G. Dowling, Assistant Head of the Military Awards Branch of the U.S. Marine Corps (the "Dowling Letter"). (Id.)

The Dowling Letter was written to Mr. Keeley in response to Mr. Keeley's January 23, 2004 letter to the Personnel Management Support Branch of the U.S. Marine Corps Headquarters (see Dkt # 210-2) seeking award entitlement and verification on behalf of Mr. Swisher's benefit application.[10]  The Dowling Letter explained that the Marine Corps believed that Mr. Swisher's claim—that he earned military decorations for his role in combat operations in Korea—was not true and that Mr. Swisher's supporting documents—the Replacement DD-214 Form listing military honors and combat injuries and the accompanying Woodring Letter—were "not authentic."  (Id.)

---

[10]The January 23, 2004 letter had been forwarded to the Marine Corps Military Awards Branch, where K. G. Dowling was Assistant Head.  Lt. Col. Dowling had been given the task of researching the issue and responding to Mr. Keeley.

On January 18, 2005, Patrick Teague, in his official capacity as IDVS Veterans Services Program Supervisor, forwarded the information he received from Mr. Keeley to Kay E. Collins at the VA's regional office with a note stating:

> I received the attached correspondence from our Northern Idaho State Service Officer, Ben Keeley, and am forwarding it for your action.  As you can see, Ben Keeley suspects fraud and after reviewing the attached letter from the Department of the Navy [the Dowling Letter], I tend to agree.
>
> As we are obligated by law to report any suspected fraud, I am forwarding this on to you for your consideration.

(Jan. 18, 2005 Mem. to Kay E. Collins from Pat Teague (attached as Ex. B to P. Teague Decl.).)

## B.  The *Hinkson* Trial

About the same time, in January 2005, Mr. Swisher was the federal government's star witness at the *Hinkson* trial.  There, Mr. Swisher testified that he was solicited by David Hinkson to murder an Assistant U.S. Attorney, an IRS agent, and a federal judge.  On the stand, Mr. Swisher wore what appeared to be a Purple Heart and testified about his military background, including that he had told Mr. Hinkson he was a Korean War combat veteran.

Wesley Hoyt, a Defendant in this case, was David Hinkson's criminal defense attorney.  During cross-examination of Mr. Swisher, Mr. Hoyt, with the court's permission, questioned Mr. Swisher about the Purple Heart, which Mr. Swisher testified had been awarded to him by the United States government.  Mr. Swisher also testified that he "was part of a special expedition [in the] Marine Corps Expeditionary Unit that was engaged in combat after the Armistice [in the Korean War], in an attempt to free POWs still in secret prison camps in North Korea.  And that information still remains classified, so I'm not sure how much more I can say on that."  United States v. Hinkson, 526 F.3d 1262, 1267 (9th Cir. 2008) (quoting transcript from Hinkson trial).

7

Mr. Hoyt, who had previously investigated Mr. Swisher's military history, showed Mr. Swisher a January 14, 2005 letter faxed to Mr. Hoyt by Bruce Tolbert, Archives Technician for the National Personnel Records Center (NPRC) (the "Tolbert Letter").  (See Dkt # 210-4.)  (The NPRC is also a Defendant in this case).  The Tolbert Letter, responding to Mr. Hoyt's request for information, stated that NPRC was

> providing the <u>requested</u> releasable military service information based on restrictions imposed by the military services consistent with Department of Defense regulations and the provisions of the Freedom of Information Act and the Privacy Act of 1974. . . .  The USMC record shows Mr. Swisher served on active duty in the USMC from August 4, 1954 to his release from active duty on August 3, 1957.  He was subsequently discharged from the USMC reserves on August 3, 1962.  In addition, Mr. Swisher's Marine Corps record has been carefully examined by the Military Awards Branch of the office of the Commandant of the Marine Corps, and that office has stated that his record fails to show that he was ever recommended for, or awarded any personal decorations.

(Jan. 14, 2005 Letter from Bruce R. Tolbert, NPRC Archives Technician to Wesley Holt Law Office (emphasis in original) (Dkt # 210-4).)[11]

After Mr. Hoyt confronted Mr. Swisher on the stand with the Tolbert Letter, Mr. Swisher reached into his pocket and pulled out a copy of what he called a "replacement DD-214 form" which he said proved he had earned the Purple Heart and was in combat in Korea.  The issue was not developed further during cross-examination.

But a few days later, Mr. Hoyt told the trial judge he had obtained a copy of an earlier DD-214 form for Mr. Swisher that did not include any information about military honors or combat injuries.  Apparently Mr. Hoyt obtained that copy from the Idaho County Auditor and

---

[11]The Marine Corps FOIA/Privacy Act office released similar information about Mr. Swisher to the POW Network based on that entity's FOIA request.

Recorder's office, where Mr. Swisher had filed it in February 2001.  See Hinkson, 526 F.3d at

1270.  Mr. Hoyt argued that the discrepancy, along with statements to Mr. Hoyt by

representatives of the NPRC that the DD-214 form found by Mr. Hoyt was the correct form,

suggested the Replacement DD-214 Form was forged.  Id.

Faced with conflicting evidence, the trial court subpoenaed Mr. Swisher's military file

from the NPRC.  (W. E. Miller Decl. ¶ 3 & Ex. A (Dkt # 87).)  Chief Warrant Officer W. E.

Miller sent the file by Federal Express, and the court received the file the next day.

The same day the court issued its subpoena, Treasury Department Special Agent Michael

Isenberg (who was assisting with the *Hinkson* trial) contacted the VA regional office by

telephone (at the prosecutor's request) to determine whether Mr. Swisher had received medals or

commendations and to obtain a copy of the DD-214 form in Mr. Swisher's file.  Special Agent

Isenberg then put the request in writing (at VA employee K. E. Collins' request).  (Michael

Isenberg Decl. ¶ 9 (Dkt # 200-5);  K. E. Collins Decl. ¶ 5 & Ex. A (Dkt # 200-6).)  Before the

VA released documents to Special Agent Isenberg, the VA Freedom of Information/Privacy Act

officer reviewed the request and determined that the VA had authority to disclose the requested

records.  (Collins Decl. ¶ 6.)  The VA sent Special Agent Isenberg a packet of information

consisting of the information Patrick Teague had sent to K. E. Collins just the day before,

including the Dowling Letter.  (Id. ¶ 7 & Ex. B.)

Special Agent Isenberg received the documents from the VA in an envelope, did not look

at them or copy them, or keep a copy for the Department of Treasury.  He delivered the

documents to Department of Justice attorneys.  The prosecutor then produced the Dowling

Letter, which was also in the file the court received from the NPRC earlier that day.  The court,

9

after an *in camera* review, provided a copy of the file to both counsel.

Despite the Dowling Letter's content, the trial court had evidentiary concerns and refused to allow Mr. Hoyt to pursue the issue further during trial.  But by then, questions had been raised at the Marine Corps and the VA, and investigations had begun.

After the jury convicted Mr. Hinkson, Mr. Hoyt filed a motion for new trial on March 3, 2005, relying in part on an affidavit from Chief Warrant Officer W. E. Miller, Marine Corps liaison to the NPRC, and an affidavit from retired Colonel W. J. Woodring, Jr. (the "Woodring Affidavit"), the Marine Corps officer who allegedly had signed Mr. Swisher's Replacement DD-214 Form and the Woodring Letter.  The affidavits together provided information that the form and letter were forged.  (See W. J. Woodring, Jr. Aff., Feb. 27, 2005 (attached as Ex. A to Michalick Decl. (Dkt # 90));  W. E. Miller Aff., Feb. 24, 2005 (Dkt # 210-4).)

**C.     Correspondence Regarding Swisher's Request For Record Correction**

On February 8, 2005, after the USMC added the Dowling Letter to Mr. Swisher's official military file, Mr. Swisher sent a letter to NPRC rebutting the conclusions in the Dowling Letter and seeking to have his rebuttal letter and the Replacement DD-214 Form added to his file.  (See Decl. of William G. Swarens ¶ 3 & Ex. B (Dkt # 92).)  Mr. Swisher copied his rebuttal letter to numerous individuals.

In response, William Swarens (Head of the Marine Corps' Personnel Management Support Branch) wrote to Mr. Swisher in May 2005.  Mr. Swarens copied the same individuals Mr. Swisher listed in his rebuttal letter.  Mr. Swarens advised Mr. Swisher that the Marine Corps had added the documents to Mr. Swisher's file but had annotated the Replacement DD-214 Form with the phrase "not valid."  Mr. Swarens' letter also enclosed a copy of the Woodring Affidavit.

(See Letter from William G. Swarens, Head, USMC Personnel Mgmt. Support Branch, to Elven Swisher (May 23, 2005) (Dkt # 92-2).)

Mr. Swisher objected to the annotation, but the Marine Corps refused to remove it. Then Mr. Swisher sought an order from this court to correct his military record. Despite the fact that Mr. Swisher continues to seek a correction of his military record, that claim was dismissed by the court's earlier order and it will not be considered now. (Sept. 24, 2007 R&R (Docket No. 136) at 58-59; Dec. 16, 2008 Mem. Decision & Order (Docket No. 214).) Nevertheless, the court includes the facts about his correspondence with Mr. Swarens because it is relevant to the Privacy Act claims.

### D.    League's Investigation and Action Regarding Mr. Swisher's Alleged Misrepresentations

Defendant National Marine Corps League is a federally-chartered but private Marine Corps veterans organization. It has an elected National Commandant, with fourteen elected National Staff Officers who serve as trustees. The National Board of Trustees coordinates the efforts of forty-eight subdivisions (organized by state) and the activities of over 900 community-based detachments located throughout the United States and overseas. The day-to-day operations of the League are under the control of National Executive Director Michael Blum, who is responsible for the management and direction of all programs, activities, and affairs of the League, as well as supervising the National Headquarters staff.

Periodically, the League holds national and local conventions. In May 2005, Steven Teague and Patrick Teague (both members of the League) attended the League's state convention in Idaho along with colleague Kenneth Pitcher (a retired IDVS veterans service officer who had

temporarily returned to his job to train Steven Teague as Ben Keeley's replacement).  At that time, all were aware of Ben Keeley's concerns about the falsity of Mr. Swisher's documentation.

Plaintiffs claim that the Teague Defendants defamed Mr. Swisher at the May 2005 convention.  According to Mr. Lindsey, "[d]uring the May 2005 State Convention in Coeur d'Alene, Idaho, at various times, Defendants Patrick and Steven Teague informed me that Plaintiff Swisher was, among other things, guilty of blackmail, extortion and rape.  Others were present."  (Lindsey Decl. (Dkt # 236-2) at 2.)

During the convention, Steven Teague gave a presentation in his capacity as a veterans services officer at IDVS.  All three men were officially thanked at the convention for their services to veterans.  But both Teague Defendants deny making any statement about blackmail, extortion and rape to Mr. Lindsey or anyone else.  (P. Teague Decl. ¶ 25; S. Teague Decl. ¶ 22.)

In June 2005, the Board of Trustees of the Lewiston Detachment suspended Mr. Swisher pending an investigation into the fraud allegations against Mr. Swisher.  (League Apr. 1, 2006 Hr'g Tr. at 7, 52 (Ex. I (Dkt # 225-15) to Voltaggio Decl.).)  But Mr. Lindsey reinstated Mr. Swisher and announced that decision to the Detachment at its August 2005 meeting.  (Id. at 23-24, 56.)

In August 2005, the League held its National Convention in Cleveland, Ohio.  During the convention, Plaintiff Walter Lindsey approached Defendant Vito H. ("Vic") Voltaggio and introduced himself as the Commandant and member of a Marine Corps League detachment in Lewiston, Idaho.  Mr. Lindsey told Mr. Voltaggio that he was having problems in his Lewiston detachment with three members (Defendants Joseph Volk, Dave Lewis, and Bill Snow) who had complained that Mr. Swisher was wearing military decorations he had not earned.  Nothing

12

immediate came of that conversation.

After the convention, Mr. Voltaggio (the League's National Judge Advocate) was contacted by Mr. Volk, who gave a much different story about Mr. Swisher's combat history. Mr. Snow also complained to Mr. Voltaggio about Mr. Swisher.

Because Mr. Voltaggio was receiving conflicting information, he requested that the League's National Commandant Frank Kish (a Defendant here) order an investigation into the issues involving Mr. Swisher's military history.  Commandant Kish assigned Defendant Dennis Dressler, an attorney and member of the League, to investigate.

In the meantime, in November 2005, Mr. Lindsey conducted a hearing through the Lewiston Detachment and expelled Mr. Volk, Mr. Lewis, and Mr. Snow from the League for making what he and the Lewiston Detachment's Board of Trustees found to be false allegations against Mr. Swisher.  (League Apr. 1, 2006 Hr'g Tr. at 71.)  The League's National Commandant later reinstated the three men, but Mr. Lindsey did not recognize or give effect to that reinstatement order.  (See id. at 71, 75, 79, 128.)

In December 2005, Patrick Teague sent two emails, using his personal email address, to Mr. Lindsey.  In the December 8, 2005 email, he stated:

> I have read the latest State sitrep of the MCL and was astounded by your article dealing with our Jr. Vice, Mr. Joe Swisher.  I cannot see for the life of me how a competent investigating committee could find in his favor.  I can only surmise that the team was not privy or did not know how to access the public files in his case. I am forwarding the two files on Mr. Swisher that leaves no doubt as to his claims being false.
>
> Please respond to this mail and let me know your course of action.  I also intend to bring this up at our convention in May in Jackpot.
>
> There have been to [sic] many Marines that have died for the purple heart and

other decorations to have an individual running around with them on his chest that
did not see combat.

(P. Teague Decl. Ex. C.)  In his declaration, Patrick Teague states that his use of the phrase "two

files on Mr. Swisher" meant links to Internet sites that contained information available to anyone

in the public.  The sites "included information which indicated that Mr. Swisher's claims he was

entitled to wear the Purple Heart and other military decorations was false.  One of the internet

sites was a U.S. Court related website and information on both internet sites related to the

*Hinckson* [sic] case and plaintiff Swisher's testimony and credibility as a witness threat."  (Id. ¶

22.)  The second e-mail, sent the next day, said "I will respect your decision but I want nothing to

do with the man, he is a fake and you know it as well as I do."  (Id. Ex. D.)

Mr. Teague explained in his declaration that he "provided information to Mr. Lindsey

because [he] was concerned about information related to Mr. Swisher's testimony at the

*Hinckson* [sic] case and information received from the Department of the Navy and VA that

indicated Mr. Swisher was wearing military decorations to which he was not entitled and that he

was not entitled to claim the increased disability benefits with which IDVS veterans services had

assisted him during my tenure with the IDVS."  (Id. ¶ 24.)

After the National League finished its investigation, Mr. Dressler issued a report

concluding that Mr. Swisher had submitted a fraudulent DD-214 form in his application for

membership and that Mr. Swisher did possess and wear decorations he did not earn.  (Voltaggio

Decl. ¶ 5.)  Based on the report, Commandant Kish convened a hearing board under Section 900

of the League's Administrative Procedure to hear charges of fraud against Mr. Swisher.  At the

same time, a hearing board was convened to hear separate charges against Mr. Lindsey, who was

14

accused of expelling members Volk, Lewis, and Snow without giving them the due process required by the League's By-Laws and Administrative Procedures.  (Id.)

On February 22, 2006, Mr. Voltaggio sent notice of the charges and the scheduled April 1, 2006 hearing to Mr. Swisher and Mr. Lindsey.  The letters were sent by certified mail return receipt requested.  In the letters, Mr. Voltaggio told the Plaintiffs that "[b]y the authority given in Section 909 of the National Administrative Procedures you are hereby temporarily suspended from membership in the Marine Corps League pending the final resolution of the charges against you."  (Exs. B & E attached to Voltaggio Decl.)

In the letter to Mr. Swisher, the charges were stated as:

1. Violation of oath of membership 912(a)
2. Violation of oath of office 912(b)
3. Conduct unbecoming a member of the Marine Corps League, or an action detrimental to the league 912(c)

(Feb. 22, 2006 Letter from Voltaggio to Swisher (Dkt # 225-8) at 2, attached as Ex. B to Voltaggio Decl.)  The letter further advised Mr. Swisher that "all of the documents provided by the Investigative Team will be entered as Exhibit (1) to the Hearing Board," and that "[t]he Petitioners in this action against you are members Joe Volk, Dave Lewis and Bill Snow of the Sgt. Major Linehan Detachment."  (Id.)  The record does not indicate whether and to whom "documents provided by the Investigative Team" were produced or what they were.

In a similar letter to Mr. Lindsey, Mr. Voltaggio stated the charges as:

1. Violation of oath of office Section 912(b) Administrative Procedures.
2. Action detrimental to the Marine Corps League Section 912(c)

(Feb. 22, 2006 Letter from Voltaggio to Lindsey (Dkt # 225-11) at 2, attached as Ex. E to Voltaggio Decl.)  Then Mr. Voltaggio elaborated:

In that you did convene a Hearing Board and you disregarded the rights of the (3) Petitioners, Joe Volk, Dave Lewis and Bill Snow by not notifying them of the Hearing Board by Certified Mail and you did not allow the (3) Petitioners to invite witnesses to attend and you did not permit the (3) Petitioners to testify on their own behalf, additionally, you did not allow for the (3) Petitioners to cross-examine witnesses.  The Hearing Board found the (3) Petitioners Guilty of all charges and subsequently expelled the members from the Marine Corps League.  The charges are clear violations of a member[']s right to a fair and impartial hearing.

Be advised that all of the documents provided by the Investigative Team will be entered as Exhibit (1) to the Hearing Board.

(Id.)

After Mr. Voltaggio informed Mr. Lindsey of the charges, Mr. Voltaggio received a letter from Mr. Lindsey notifying him that after the National League's reinstatement of the three members of the Sgt. Major Linehan Detachment, Mr. Lindsey re-suspended the three men.  (See Mar. 1, 2006 Letter from Voltaggio to Lindsey (Dkt # 225-12) at 1 (citing Feb. 24, 2006 Letter from Lindsey to Voltaggio), attached as Ex. F to Voltaggio Decl.)  Mr. Voltaggio responded that, in his opinion, Mr. Lindsey had violated the League's Administrative Procedures.  (See id. at 2 (Dkt #s 168-2 p. 11 and 225-12 p. 2).)

Then, in a March 7, 2006 Letter (sent certified mail return receipt requested), Mr. Voltaggio notified Mr. Lindsey that he was temporarily suspended from the League pending final resolution of the charges against him under League Administrative Procedures sections 912(b) and (c).  Specifically, he said the suspension was "warranted by your continued defiance of a ruling handed down by my office reinstating members, Joe Volk, Dave Lewis and Bill Snow" and that the charges relating to that alleged defiance would be heard on April 1, 2006.  (Mar. 7, 2006 Letter from Voltaggio to Lindsey (Dkt # 225-13), attached as Ex. G to Voltaggio Decl.)  On

16

March 14, 2006, Mr. Lindsey responded to Mr. Voltaggio's February 22 and March 1 letters, but not to Mr. Voltaggio's March 7 letter.  (See Mar. 14, 2006 Letter from Lindsey to Kish (National League Commandant) (Dkt # 225-14), attached as Ex. H to Voltaggio Decl.)

According to Mr. Swisher, he did not receive proper or timely notice of the charges because (1) he did not actually receive the February 22 letter until March 27th; and (2) the February 22 letter did not elaborate on the nature of the charges.  (See Ex. 2H to Second Am. Compl. Pt. 1.)  He also claimed that he never received documents comprising evidence to be presented at the hearing, that he did not receive a copy of the grievances filed against him, that the temporary suspension was illegal, and that Judge Advocate Voltaggio did not have jurisdiction over him.  (Id.)  It appears that Mr. Lindsey contends he did not receive timely or proper notice concerning the charges against him, particularly because he says he was convicted of charges at the April 2006 hearing that were not officially noticed under the Bylaws.

Nevertheless, the hearing was held on April 1, 2006, in Lewiston, Idaho.  The hearing board consisted of Defendants Paul Hastings, Barry Georgopolous, Helen Hicks, and Mr. Voltaggio.  The League's By-Laws and Administrative Procedures governed not only the pre- and post-hearing procedures, but the hearing as well.  This is the contract Plaintiffs contend was breached.[12]

The proceedings were closed to the public (including League members who were not directly participating in the hearing).  Indeed, Defendants Patrick Teague and Steven Teague

---

[12]In an earlier order, the court noted, without deciding the issue, that the League's By-Laws and Administrative Procedures may constitute a contract between the Plaintiffs and the League.  (See Sept. 24, 2007 R&R (Docket No. 136) at 48-49; Dec. 16, 2008 Mem. Decision & Order (Docket No. 214).)

went to the hearing site, but they were not admitted.  On their way out, they spoke to Mr.

Lindsey, and then left.  They did not discuss Mr. Swisher or the subject of the hearing.  (S.

Teague Decl. ¶ 19.)  Nevertheless, the Plaintiffs allege that both Teague Defendants defamed

them at the League hearing.

Mr. Swisher alleges, through conclusory statements lacking specificity about where and

to whom (and which lack foundation), that the Teague Defendants accused him of perjury,

extortion, blackmail, rape, and fraud;  Mr. Lindsey, also with the same type of conclusory

statement and no admissible evidence, alleges that both Teague Defendants said he was a liar,

thief, and stalker.  (See Pls.' Mem. Opp'n Teague Defs.' Mot. Summ. J. at 4-5 (citing to Pls.'

Response to Teague Defs.' Mem. Supp. Mot. Dismiss (Dkt # 118) at 17-18) (unsworn);  Second

Am. Compl. Pt. 5 at 11-13 (sworn).)

In a declaration submitted by Mr. Lindsey in response to the Teague Defendants' Motion

for Summary Judgment, he testified that "[a]t the April 1, 2006 National Marine Corps League

(Defendant) hearing, I personally observed the Defendants Steven Teague, Patrick Teague and

Dennis Dressler standing and talking with Defendant Hinkson and his wife."  (Dkt # 236-2 at 2.)

Assuming the truth of this statement, it proves nothing.  He also says "I have been informed by

other Marine Corps League members that both Defendants, Steven Teague and Patrick Teague

have called me a liar and a stalker."  (Id.)  This is inadmissible hearsay and does not rebut the

sworn statements of Steven Teague, Patrick Teague, and Kenneth Pitcher, all of whom provide

testimony contradicting the Plaintiffs' allegations.  (See P. Teague Decl. ¶ 25; S. Teague Decl. ¶

22.)  Mr. Swisher also submits a declaration, but it too proves nothing because it does not contain

any information about defamatory statements.  (See Decl. of Elven Joe Swisher (Dkt # 236-3).)

In short, the Plaintiffs' have failed to create a genuine dispute of material fact regarding whether Patrick and Steven Teague made the allegedly defamatory statements about the Plaintiffs at the April 2006 hearing (or anywhere else for that matter).[13]

During the hearing, both Mr. Lindsey and Mr. Swisher were permitted to call witnesses, review and respond to the evidence of the charges against them, and to present arguments regarding their defenses to the charges.  Both of them were represented by advocates during the hearing.  The hearing regarding Mr. Lindsey lasted more than four hours.  (See Apr. 1, 2006 Hr'g Tr. at 183 (attached as Ex. I to Voltaggio Decl.).)  The hearing regarding Mr. Swisher lasted approximately four hours.  (Voltaggio Decl. ¶ 20.)

Mr. Lindsey, after a lengthy hearing, admitted the charges, was found guilty, and was

---

[13]The Plaintiffs allege defamation against League members Mike Meade (who represented Dave Lewis and Bill Snow at the April 1, 2006 League Hearing), Robert Gilmore, Duane Anderson, and Michael Blum.  Plaintiffs have not presented evidence of any defamatory statements made by these individual defendants.  For example, Mr. Swisher states in conclusory fashion that "all of the foregoing Defendants [including Mr. Gilmore, Mr. Blum, and Mr. Anderson] have referred to Plaintiffs as an extortionist, blackmailer, rapist and/or stalker." (Second Am. Compl. Pt. 1 ¶ 37 (signed under penalty of perjury); see also id. ¶ 62 ("In exparte conversations and emails, Defendant Mead[e] parroted Defendants Hinkson and Volk's malicious message of Plaintiff Swisher's guilt of blackmail and rape.  He also viciously stated that both Plaintiffs were sociopaths and evil and that Plaintiff Lindsey was a stalker and should never have held an office in the Marine Corps League.").)  The vague and conclusory statements in their Second Amended Complaint (even though signed under penalty of perjury) lack foundation and do not constitute evidence sufficient to defeat summary judgment.  See, e.g., Peterson v. Hewlett-Packard Co., 358 F.3d 599, 603 (9th Cir. 2004) (to survive summary judgment, evidence must be "more than purely conclusory allegations . . . with no concrete relevant particulars.") (internal citation and quotation marks omitted); Thornhill Publ'g Co., Inc. v. General Tel. & Elec. Corp., 594 F.2d 730, 738 (9th Cir. 1979) (conclusory and speculative affidavits do not establish genuine issue of material fact).  (See also Decl. of Michael A. Blum (Dkt # 225-5) ¶¶ 5-8 (providing admissible evidence that he did not make any communication concerning Plaintiffs that would be considered defamatory and providing an express denial of ever doing so).)

given a two-year suspension of all rights and privileges as a member of the League.  Defendants

Volk, Snow, and Lewis were reinstated.  Mr. Swisher was found guilty of the charges against

him and was permanently expelled as a member of the League.

E.     **Idaho Observer's Reporting of the Proceedings**

As part of the Second Amended Complaint, Plaintiffs attached what purports to be an

excerpt of an editorial or article written by Defendant Don Harkins (editor of the Idaho Observer)

and published in The Idaho Observer (also a Defendant) in April 2006.  (See Second Am. Compl.

Pt. 2 (Dkt # 169) Ex. 2DD.)  Mr. Swisher contends that the article/editorial is defamatory.[14]

The article/editorial[15] (which does not list an author) stated that Mr. Swisher is a

---

[14]Mr. Swisher also asserts that in February 2005 the Idaho Observer published an article titled "Bird on a wire: The persecution of Dave Hinkson" that defamed him.  (See Second Am. Compl. Pt. 5 ¶ 129.)  But he does not attach a copy of the article to his opposition papers or the Second Amended Complaint.  In other papers filed with the court for earlier proceedings, the Plaintiffs submitted a copy of the article.  (See Mar. 8, 2007 Aff. of Elven Joe Swisher (Dkt # 113) ¶ j ("Exhibit 10 is a true copy of the February 2005 Idaho Observer article, 'Bird on a Wire, the Persecution of Dave Hinkson' taken from an internet posting.") (emphasis added); Ex. 10 to Dkt # 113 (Dkt # 115-3).)  But the publication does not bear any marks or characteristics that support a finding of authenticity.  First, Mr. Swisher states without foundation or elaboration that the article was "taken from an internet posting" without identifying the source of the posting.  This does not support a claim of authenticity or reliability.  Moreover, the document is not in the form of a published article, does not list an author, has a casual, rambling, and angry tone, contains improper grammatical usage, and cites to federal statutes, all of which indicate that it was not published by a newspaper.  Accordingly, the court finds that it is not admissible evidence.  But even if the court were to consider Mr. Swisher's contention in the Second Amended Complaint that the purported article defamed him because it stated that he perjured himself during the *Hinkson* trial, his claim is dismissed based on the court's earlier order striking "all allegations in the second amended complaint that . . . allege that Swisher was defamed by accusations that he lied during the Hinkson trial."  (Dec. 16, 2008 Mem. Decision & Order (Dkt # 214) at 3-4.)

[15]The article/editorial has not been authenticated by the Plaintiffs and has no foundation. Nevertheless, Defendants Idaho Observer and Mr. Harkins, for sake of argument only, ask the court to assume that the statements in the article/editorial were actually published in the form and substance alleged by the Plaintiffs, as set forth in Exhibit 2DD.

"pathological liar," that Mr. Swisher perjured himself during the *Hinkson* trial, that Mr. Swisher was expelled for life from the Marine Corps League after the League found him guilty of submitting fraudulent documents (the Replacement DD-214) and wearing military honors that were not earned, that the National Personnel Records Center verified that Mr. Swisher was a "fraud," that Mr. Swisher forged military documents ("according to the Record Center"), that Retired Marine Colonel Woodring "confirmed that his signature on Swisher's DD214 was a forgery," that Mr. Swisher "was never in any combat situation," and that, "according to the Personnel Record Center, Swisher is not entitled to any [military] decorations," and that Mr. Swisher used his "fraudulent papers . . . to obtain, at taxpayers' expense–not only open heart surgery but—$30,000.00 back pay [and an] ongoing income stream of $2,500.00 per month."[16] (Id.)

## F.    Roland Hinkson's Statements

Roland Hinkson is the father of David Hinkson, against whom Mr. Swisher testified during the murder-for-hire trial.  Plaintiffs allege he made defamatory statements in a memorandum from Mr. Hinkson to Vic Voltaggio (dated March 29, 2006) (which was accompanied by a purported affidavit from Mr. Hinkson) (see Ex. I-1 attached to Pls.' Opp'n Mem. (Dkt # 233); during a May 19, 2006 radio broadcast of the "Officer Jack McLamb show" (see excerpts from transcript, Ex. I-2 attached to Pls.' Opp'n Mem. (Dkt # 233); during a May 25, 2006 radio broadcast of the "Lou Epton Show" (see id.); a document called "Mission Statement" and "Open Letter" (attached as Ex. A-6 to Feb. 15, 2009 Swisher Decl. (Dkt # 233-2); and a

---

[16]Mr. Lindsey makes no allegations of defamation against the Idaho Observer or Don Harkins.

Memorandum from "Roland Hinkson, Investigative Reporter" to "US Marine Corps,

Commandant's Office" (dated November 3, 2008) titled "Elvin Joe Swisher's Criminal

Conviction and Sentence Recommendation" (attached as Ex. A-7 to Feb. 15, 2009 Swisher

Decl.).[17]

But the documentation they provide is not admissible because it has not been properly

authenticated and has no foundation.  Neither Plaintiff provides any sworn statements of

foundation or authentication anywhere in the record.  The documents are just attached to

pleadings.

There is no evidence that Mr. Hinkson actually wrote or made the statements in the

written documents or that such documents were actually published.  There is no evidence about

where, from whom, or when the documents were obtained.

And the reliability of the transcripts of the radio broadcasts is questionable.  There is no

evidence of who transcribed the broadcasts, from what source the transcriptions came, whether

the statements were accurately recorded, or whether the statements were even made.  The best

evidence Mr. Swisher can provide is a statement in an affidavit (sworn but lacking a statement

that Mr. Swisher had any personal knowledge) that the exhibits are true copies of the transcripts

of Mr. Hinkson's alleged statements "taken from transcripts of radio broadcasts posted at 'The

---

[17]Plaintiffs also attempt to tie Defendant Wesley Hoyt to the same exhibits in order to allege defamation against him.  But they cannot overcome the same foundation and authenticity problems mentioned above.  Moreover, their characterization of alleged statements by Mr. Hoyt is inaccurate.  Contrary to what they allege, nothing in those documents (in particular, Exhibit A-7 (also known as Ex. H-1)) shows any false statement that could be attributed to Mr. Hoyt. And, as noted repeatedly, the Plaintiffs' reliance on conclusory allegations (e.g., claiming that Mr. Hoyt called Mr. Lindsey a stalker and called Mr. Swisher a rapist, blackmailer, etc.) is not sufficient to defeat Mr. Hoyt's motion for summary judgment.

Last Outpost' on the internet" and "complete transcripts made from the Hinkson, Epson,

McLamb audio interviews broadcasted [sic] on the world wide web as previously indicated."

(Mar. 8, 2007 Swisher Aff. (Dkt # 113) ¶¶ *l*-m.)

Without those documents, which the court may not rely upon under the Federal Rules of

Evidence, the Plaintiffs are left with unsupported and conclusory allegations in their papers that

Mr. Hinkson made defamatory statements.  Despite the voluminous amount of paper submitted,

there is no admissible evidence in the record against Mr. Hinkson.

**G.**     **VA Investigation and Decision Regarding Mr. Swisher's Disability Benefits**

In 2005 and 2006, the VA conducted an investigation concerning Mr. Swisher's benefit

application and award.  As part of that investigation, after discussions between the VA and

USMC concerning the validity of Mr. Swisher's documentation and his benefit application, G.

Michalick, Assistant Head of the Records Correspondence Section in the Marine Corps'

Personnel Management Support Branch, sent the Woodring Affidavit to K. E. Collins at the VA

Regional Office, verifying that the Replacement DD-214 Form was "not a valid DD 214."[18]

In 2006, the VA reduced Mr. Swisher's disability benefits and ordered him to reimburse

the VA for the improperly obtained funds.  (See VA July 12, 2006 Rating Decision (Dkt # 210-

10); Nov. 8, 2006 VA Statement of the Case (Dkt # 210-11).)

**H.**     **Mr. Swisher's Criminal Conviction**

The allegations of fraud and perjury later evolved into a July 2007 federal criminal

---

[18]See Letter from G. Michalick, Asst. Head, Records Correspondence Section, USMC
Personnel Mgmt. Support Branch, to K. E. Collins, Veterans Serv. Ctr. Mgr., Dep't of Veterans
Affairs, VA Regional Office (Apr. 26, 2005) (Dkt # 210-11).

23

indictment against Mr. Swisher, who was convicted in April 2008 for knowingly wearing Armed

Forces decorations and medals without authority; willfully and knowingly making materially

false and fraudulent representations that he was injured during combat during the Korean War, in

an effort to obtain additional VA benefits to which he was not entitled; falsifying and submitting

a document (the "forged DD-214 form"), in which he falsely listed combat injuries and military

awards in an effort to obtain additional VA benefits to which he was not entitled; and illegally

obtaining and converting disability benefits from the VA to his own use through his false

testimony and the forged DD-214 form.[19]  (Special Verdict Form (Docket No. 66) in <u>United

States v. Swisher</u>, Case No. 1:07-CR-182 (D. Idaho).)  <u>See also</u> <u>United States v. Hinkson</u>, 526

F.3d 1262, 1265-77 (9th Cir. 2008) (describing, in great detail, events surrounding Mr. Swisher's

testimony during <u>Hinkson</u> trial and subsequent investigation, indictment, and conviction of Mr.

Swisher).

## II.  PROCEDURAL BACKGROUND

*Pro se* Plaintiffs filed their original complaint in August 2006, naming forty defendants

and alleging numerous claims against private and government defendants.  In response to the

original complaint, the Defendants filed various motions to dismiss.  The court's rulings on those

motions resulted in dismissal of a large group of private and government defendants and many of

the Plaintiffs' claims as well.  (<u>See</u> Sept. 6, 2007 Report & Recommendation ("R&R") (Docket

No. 134);  Sept. 25, 2007 Order Adopting R&R (Docket No. 137);  Sept. 24, 2007 R&R (Docket

No. 136); Mar. 10, 2008 Mem. Decision & Order Adopting R&R (Docket No. 156); Dec. 16,

---

[19]As of the date of this Order, Mr. Swisher's appeal of his conviction is pending before
the Ninth Circuit Court of Appeals.

2008 Mem. Decision & Order (Docket No. 214).)  For a thorough background, read United

States Magistrate Judge Larry M. Boyle's September 24, 2007 Report and Recommendation

(Docket No. 136).

In the court's dismissal order, it allowed Plaintiffs to amend their complaint, but with

certain limitations:

> Plaintiffs may not add additional claims . . . or amend their complaint to re-assert
> claims dismissed by this Court in adopting Judge Boyle's R&R.  Any such claims
> asserted in the amended complaint will be summarily dismissed.
>
> However, Plaintiffs must amend their complaint to comply with the
> Court's order granting Defendants' request for a more definite statement.
> Plaintiffs shall amend their Complaint to set forth their Privacy Act claims in a
> manner that designates which particular defendants violated the Act and the
> general manner in which each Defendant violated the Act.  Likewise, the amended
> complaint must include the remaining defamation claims.

(Mar. 10, 2008 Mem. Decision & Order at 7-8.)

On April 9, 2008, the Plaintiffs filed their Amended Complaint (Docket No. 159).  But

then the remaining Defendants filed motions to strike the Amended Complaint, or, in the

alternative, for a more definite statement.  While those motions were pending, the Plaintiffs filed

a five-part Second Amended Complaint ("SAC") (which was also a response to the Defendants'

motions for a more definite statement).  Each part of the SAC contains allegations against a

defined group of Defendants.  (See SAC Pt. 1 (Dkt # 168) (addressed to League Defendants);

SAC Pt. 2 (Dkt # 169) (addressed to Defendant Hoyt); SAC Pt. 3 (Dkt # 170) (addressed to

federal agency Defendants); SAC Pt. 4 (Dkt # 172) (addressed to State [Teague] Defendants);

SAC Pt. 5 (Dkt # 173) (addressed to Idaho Observer Defendants).)

In response to the motions, the court issued an order striking "all allegations in the second

amended complaint that attempt to allege new claims (or re-allege dismissed claims) or allege that Swisher was defamed by accusations that he lied during the <u>Hinkson</u> trial." (Dec. 16, 2008 Mem. Decision & Order (Dkt # 214) at 3-4.) As discussed below, the court relies on the December 2008 Order to dismiss some of Plaintiffs' remaining claims.

The court also notes that, according to the record, Plaintiffs, who allege defamation against state employees Patrick Teague and Steven Teague, did not file a notice of claim with Idaho's Secretary of State under the Idaho Tort Claims Act § 6-905.[20]  (<u>See, e.g.</u>, Decl. of Miren Artiach, Deputy Secretary of the State of Idaho  ¶ 2 (Dkt # 222-7) ("I have reviewed the appropriate records and hereby affirm that no claim pursuant to the Idaho Tort Claims Act has been filed by the plaintiffs in the above-referenced action in the office of the Idaho Secretary of State.").) This fact is relevant if the Teague Defendants were acting within the course and scope of their employment at the time they allegedly made defamatory statements because, as discussed below, such notice is a mandatory condition precedent to bringing suit.  <u>See, e.g.</u>, <u>Overman v. Klein</u>, 654 P.2d 888, 890 (Idaho 1982).

### III.  <u>ANALYSIS</u>

The motions currently before the court have been filed by all five sets of Defendants and address the remainder of Plaintiffs' case.

### A.     <u>Standard of Review</u>

The Defendants, to succeed in their motions for summary judgment, must show that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law.

---

[20]Nowhere in the Plaintiffs' complaint do they allege that they filed such a notice.

Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986); <u>Idaho Rural</u>

<u>Council v. Bosma</u>, 143 F. Supp. 2d 1169, 1174 (D. Idaho 2001).  To withstand the motions for

summary judgment, Plaintiffs

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which [they bear] the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

<u>British Motor Car Distrib., Ltd. v. San Francisco Auto. Indus. Welfare Fund</u>, 882 F.2d 371, 374

(9th Cir. 1989).  "For an issue to be 'genuine,' there must be evidence such that a reasonable jury

could reach a verdict in favor of the nonmoving party."  <u>Summers v. A. Teichert & Son, Inc.</u>, 127

F.3d 1150, 1152 (9th Cir. 1997).

The court must view the evidence in a light most favorable to the Plaintiffs.  But if the

Defendants have shown the absence of a genuine issue of material fact, the Plaintiffs "must go

beyond the pleadings" and cite to affidavits, depositions, answers to interrogatories, or other

documentary evidence to show that a genuine issue of material fact does indeed exist.  <u>Idaho</u>

<u>Rural Council</u>, 143 F. Supp. 2d at 1174 (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324

(1986).  Furthermore, the evidence must be admissible and significantly probative.  <u>Id.</u>;

<u>Summers</u>, 127 F.3d at 1152 ("mere 'scintilla' of evidence will not be sufficient to defeat a

properly supported motion for summary judgment;  rather, the nonmoving party must introduce

some 'significant probative evidence tending to support the complaint.'") (quoting <u>Anderson v.</u>

<u>Liberty Lobby, Inc.</u>, 477 U.S. at 252).  When reviewing the evidence, the court may not judge

credibility[21] or weigh the evidence.  Id.

The court notes that *pro se* litigants, such as the Plaintiffs, are held to the same standards as litigants represented by a licensed attorney.  King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987).

**B.      Plaintiffs' "Request" for Additional Discovery**

Plaintiffs contend in various pleadings "that their case would be stronger if they had been able to participate more fully in the discovery process and obtain additional affidavits in support of their positions."  (E.g., Pls.' Mot. Deny Idaho Observer Defs.' Mot. Summ. J. (Dkt # 232) at 2.)  To the extent Plaintiffs are requesting a stay or denial of the motions under Rule 56(f) of the Federal Rules of Civil Procedure,[22] they are not entitled to such relief because they have had ample time and opportunity to conduct discovery and they have not met their burden under Rule 56(f).

"To prevail under [Rule 56(f)], parties opposing a motion for summary judgment must make (a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actually exists."  Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1129 (9th

---

[21]Plaintiffs contend that the court should deny the motions for summary judgment because "there are issues as to material fact that cannot be resolved without observation of the demeanor of federal [or other] witnesses [at trial]."  (E.g., Pls.' Mot. to Deny Fed. Agencies' Mot. Summ. J. (Dkt # 209) at 2.)  Their contention is unpersuasive because they rely on an incorrect characterization of the standards applicable to the review of motions for summary judgment.

[22]Rule 56(f) provides that "[i]f a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order."

Cir. 2004) (internal quotation marks and citations omitted).  The Plaintiffs must also "proffer

sufficient facts to show that the evidence sought exists, and that it would prevent summary

judgment." Id. at 1129-30 (internal quotation marks and citations omitted).  Plaintiffs have not

satisfied any of the above requirements.

Also, the Plaintiffs improperly attempt to rely not only on the materials they submitted in

response to the motions for summary judgment but on "all previous pleadings, motions,

memorandums, briefs, affidavits, Complaints and all other filings of Plaintiffs." (Mot. to Deny

Idaho Observer Defs.' Mot. Summ. J. (#232) at 2;  see also, e.g., Pls.' Brief Supp. Mot. to Deny

Fed. Agencies' Mot. Summ. J. at 1 (#209-2) (same).)  The court is not required to ferret out facts

from the entire record to support the Plaintiffs' arguments.  See, e.g., Dennis v. BEH-1, LLC, 520

F.3d 1066, 1069 n.1 (9th Cir. 2008) ("We will not manufacture arguments for an appellant . . . .

'Judges are not like pigs, hunting for truffles buried in briefs.'") (internal quotation marks and

citations omitted);  Corely v. Rosewood Care Ctr., Inc. of Peoria, 388 F.3d 990, 1001 (7th Cir.

2004) ("[W]e will not root through the hundreds of documents and thousands of pages that make

up the record here to make [plaintiff's] case for him. 'Judges are not like pigs, hunting for truffles

buried in the record.'") (internal quotation marks and citations omitted).

Here, the court will rely only on the record established by earlier court orders and the

parties' briefing of the motions for summary judgment, including documents to which parties

specifically cite in their briefs and statements of fact.

C.      **The Merits**

1.      **Privacy Act Claims Against Federal Agencies**

The only remaining claims against the federal agency defendants[23] are Plaintiff Swisher's Privacy Act claims against the United States Marine Corps (USMC), National Personnel Records Center (NPRC), the Department of Treasury, and Department of Veterans Affairs (VA).[24]

The Privacy Act, 5 U.S.C. § 552a (the "Act"), protects the privacy of records kept by a federal agency in a "system of records" from which an individual's records are retrieved by the name of that individual or his identifying number.  5 U.S.C. § 552a(a)(5), (b).  A "record" is defined as "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number" or other identifier.  5 U.S.C. § 552a(a)(4).

To prove a violation of the Act, a plaintiff must establish the following five elements:

(1)     that the information allegedly disclosed is covered by the Act as a "record" contained in a "system of records";
(2)     that the agency disclosed the information;
(3)     that the disclosure was without plaintiff's consent and did not fit within one of the enumerated exceptions to the anti-disclosure provision;
(4)     that the disclosure was willful or intentional; and
(5)     that the plaintiff suffered damages.

---

[23]To the extent Mr. Swisher is attempting to bring a claim against the federal agencies under the Freedom of Information Act (FOIA) (for example, his complaint about release of information about him to the POW Network based on that organization's FOIA request, or his complaint about receiving redacted records in response to his own FOIA request), those claims are dismissed because they are not based on the Privacy Act (a limit imposed by the order allowing Plaintiffs to amend their original complaint).

[24]Plaintiff Walter Lindsey has not alleged any claims against the federal agencies.

Gowan v. U.S. Dep't of Air Force, 148 F.3d 1182, 1193 (10th Cir. 1998); Lane v. Dep't of

Interior, 523 F.3d 1128, 1140 (9th Cir. 2008); Quinn v. Stone, 978 F.2d 126, 131 (3d Cir. 1992).

The Act's disclosure provisions provide in relevant part as follows:

> No agency shall disclose any record which is contained in a system of records by
> any means of communication to any person, or to another agency, except pursuant
> to written request by, or with the prior written consent of, the individual to whom
> the record pertains, unless disclosure of the record would be . . . (2) required under
> section 552 of this title [the Freedom of Information Act ("FOIA")]; (3) for a
> routine use as defined in subsection (a)(7) of this section and described under
> subsection (e)(4)(D) of this section; . . . (6) to the National Archives and Records
> Administration as a record which has sufficient historical or other value to warrant
> its continued preservation by the United States Government . . .; (11) pursuant to
> the order of a court of competent jurisdiction; . . .

5 U.S.C. § 552a(b) (emphasis added).

According to the federal agency defendants, no Privacy Act violation has occurred for

multiple reasons:

> Some disclosures contested by Plaintiff do not meet the definition of documents
> kept in a "system of records."  Other disclosures were made under written
> authorization by Plaintiff.  The remaining disclosures fall within the categories
> allowing for release without consent.  In addition, even if a violation had occurred,
> Plaintiff still does not have a cause of action because any violation was not
> intentional and willful within the meaning of the [Privacy Act].

(Fed. Agencies' Brief Supp. Mot. Summ. J. (Dkt # 200-2) at 11.)  The court agrees.

a.    Alleged Disclosure by the Department of Treasury

First, no claim exists against the Department of Treasury ("Treasury").  The only

connection Treasury has to this matter is Special Agent Isenberg, who obtained records about Mr.

Swisher while assisting Department of Justice (DOJ) attorneys with the *Hinkson* trial.  Special

Agent Isenberg did not look at the records, much less copy them.  He delivered the documents

only to the DOJ attorneys.  In essence, Treasury did not disclose any of its own documents.

Special Agent Isenberg was simply the "middle man" and the documents were not "records" kept by Treasury or "maintained" in a "system of records" by Treasury as defined under the Act.

        b.        <u>Disclosure by the Veterans Administration</u>

Disclosure of records without consent is authorized by the "routine use" exception set forth in section 552a(b)(3).  A "routine use" is defined as release of the record "for a purpose which is compatible with the purpose for which it was collected."  5 U.S.C. 552a(a)(7).  The Act also requires that each agency publish its routine uses in the Federal Register and describe the categories of users and the purpose of such use.

The VA has published its routine uses under the Act, which are set forth in relevant part as follows:

> 4. Any information in this system, except for the name and address of a veteran, which is relevant to a suspected violation or reasonably imminent violation of law, whether civil, criminal or regulatory in nature . . ., may be disclosed to a Federal . . . agency charged with the responsibility of investigating or prosecuting such violation, or charged with enforcing or implementing the statute, regulation, rule or order issued pursuant thereto.

> 5. The name and address of a veteran, which is relevant to a suspected violation or reasonably imminent violation of law, whether civil, criminal or regulatory in nature . . ., may be disclosed to a Federal agency charged with the responsibility of investigation or prosecuting such violation or charged with enforcing or implementing the statute, regulation, rule or order issued pursuant thereto, in response to its official request.

> . . . .

> 8. Any information in this system, except for the name and address of a veteran, may be disclosed to a Federal agency in order for the VA to obtain information relevant to the issuance of a benefit under title 38 U.S.C.  The name and address of a veteran may be disclosed to a Federal agency under this routine use if they are required by the Federal agency to respond to the VA inquiry.

> . . . .

29. Any relevant information (including changes in disability ratings) may be disclosed to the Department of Justice and United States Attorneys in the defense or prosecution of litigation involving the United States . . . .

41 Fed. Reg. 9294 (Mar. 3, 1976), as amended by 63 Fed. Reg. 37941 (July 14, 1998) & 65 Fed. Reg. 37605 (June 15, 2000).

The VA's disclosure to Special Agent Isenberg is protected under the routine uses set forth above.  The documents had been provided to the VA due to concerns about possible fraud by Mr. Swisher in his application for benefits, including his claim of combat injuries and military honors.  And the release of a record to a law enforcement agency for DOJ attorneys to be used in determining whether a witness committed perjury falls within routine uses 4, 5, and 29.  In addition, to the extent the VA disclosed Mr. Swisher's information to the NPRC or the Marine Corps seeking verification of combat injuries and a determination of which DD-214 form was correct, such a disclosure was appropriate under routine use 8.

      c.      <u>Disclosure by the U.S. Marine Corps</u>

The Department of Defense (DoD), of which the Marine Corps is a part, has published the following relevant routine use:

AP3.1.  Routine Use – Law Enforcement
If a system of records maintained by a DoD Component to carry out its functions indicates a violation or potential violation of law, whether civil, criminal, or regulatory in nature, . . . the relevant records . . . may be referred . . . to the Agency concerned, whether Federal, State, local or foreign, charged with the responsibility of investigating or prosecuting such violation or charged with enforcing or implementing the statute, rule regulation, or order issued pursuant thereto.

65 Fed. Reg. 7732 (Feb. 16, 2000).  The Marine Corps' disclosure of Mr. Swisher's records to the VA were allowed by the above-cited routine use.  The VA is the federal agency charged with

administering the veterans disability benefits programs.  Whether a veteran applicant qualifies for

benefits certainly falls within the VA's functions.  Routine Use AP3.1 also authorizes disclosures

to law enforcement agencies such as the VA Office of Inspector General, the FBI, and the DOJ,

where such information was used to determine whether fraud had occurred in connection with

Mr. Swisher's application for disability benefits and his sworn testimony on the witness stand.

      Mr. Swisher claims that release of information contained in the Dowling Letter (written

by Lt. Col. Dowling of the USMC to Ben Keeley) was a violation of the Act.  But, again, the

USMC's routine use allows disclosure to not only to a federal agency but also to a concerned

state agency "charged with the responsibility of investigating or prosecuting such violation or

charged with enforcing or implementing the statute, rule, regulation, or order issued pursuant

thereto."  The IDVS was responsible for assisting veterans in obtaining VA disability benefits.

Such responsibility falls within the category of an agency responsible for implementing an aspect

of the VA's disability benefits program.

      As for the Marine Corps' release of information to the POW Network based on a FOIA

request, such release was authorized by FOIA and so falls within the non-disclosure exceptions

of the Privacy Act.

        d.    <u>Disclosures by the National Personnel Records Center (NPRC)</u>

      The NPRC is part of the National Archives and Records Administration (NARA).  In this

case, information disclosed by NPRC falls within the exclusion for proper disclosure under

FOIA.

      First, the Tolbert Letter was issued as a brief response to a FOIA request.  It provided the

dates Mr. Swisher served and the fact that Mr. Swisher's records did not reflect any awards

34

commendations.  The information provided in the Tolbert Letter relates to military awards, duty station, duty assignments, and duty status.  And that information is releasable under FOIA.  See 32 C.F.R. § 310.22(b)(5)(ii) (allowing release of information of military personnel including name, rank, date of rank, past duty assignments, promotion sequence number, awards and decorations, and duty status at any given time).

Second, the NPRC's response to the *Hinkson* court's subpoena certainly falls within the non-disclosure exception set forth in Privacy Act section 552a(b)(11) (allowing release based on order of court of competent jurisdiction).

Third, the Miller Affidavit is not a "record" as defined by the Act.  Rather, it contained opinions about how military rules would handle a correction to a DD-214 form and the authenticity of the Replacement DD-214 Form, which Mr. Swisher had already disclosed in open court and filed in a recorder's office in Idaho.  See also Wilborn v. Dep't of Health & Human Servs., 49 F.3d 597, 600 (9th Cir. 1995) ("courts have agreed that the Privacy Act does not necessarily cover disclosure of information merely because it happens to be contained in the records"), abrogated on other grounds, Doe v. Chao, 540 U.S. 614 (2004).

        e.      No Evidence of Willful or Intentional Violation of Privacy Act

Mr. Swisher has not presented any evidence that any purported violation of the Act was willful or intentional as that is defined by the statute and case law.  Something more than gross negligence is required to support a claim for damages under the Act.  Johnston v. Horne, 875 F.2d 1415, 1422-23 (9th Cir. 1989), overruled on other grounds, Williams-Scaife v. Dep't of Defense Dependent Schools, 924 F.2d 346 (9th Cir. 1991).  "Evidence of conduct which would meet a greater than gross negligence standard, focusing on evidence of reckless behavior and/or

knowing violations of the Act on the part of the accused, must be advanced by a claimant at the summary judgment stage . . . ." Moskiewicz v. U.S. Dep't of Agric., 791 F.2d 561, 564 (7th Cir. 1986). The evidence on the record supports a finding that the disclosures in this case were made with a good faith belief that the disclosure was lawful or required.

For all the foregoing reasons, the Federal Agencies are entitled to summary judgment on the Privacy Act Claims.

### 2. Defamation Claims

The Supreme Court of Idaho recently stated the elements of a defamation claim:

> In a defamation action, a plaintiff must prove that the defendant:
> (1) communicated information concerning the plaintiff to others; (2) that the information was defamatory; and (3) that the plaintiff was damaged because of the communication.  As a fourth element, when a publication concerns a public official, public figure, or matters of public concern and there is a media defendant, the plaintiff must also show the falsity of the statements at issue in order to prevail in a defamation suit.  Finally, if the plaintiff is a public figure, . . . the plaintiff can recover only if he can prove actual malice, knowledge of falsity or reckless disregard of truth, by clear and convincing evidence.

Clark v. Spokesman-Review, 163 P.3d 216, 219 (Idaho 2007) (internal citations omitted).  The Clark court then elaborated on the "actual malice" element:

> Actual malice is not defined as an evil intent or a motive arising from spite.  In a defamation action, actual malice is knowledge of falsity or reckless disregard of truth.  Mere negligence is insufficient; the plaintiff must demonstrate that the author in fact entertained serious doubts as to the truth of his publication or acted with a high degree of awareness of . . . probable falsity.  The standard of actual malice is a subjective one.

Id. at 220 (internal citations omitted).

Here, some of the defendants contend that Mr. Swisher is a public figure and cannot establish actual malice.  And most, if not all, of the defendants rely on truth as a defense:

> It is axiomatic that truth is a complete defense to a civil action for libel.  In a slander or libel suit it is not necessary for the defendant to prove the literal truth of his statement in every detail, rather it is sufficient for a complete defense if the substance or gist of the [allegedly] slanderous or libelous statement is true.

Baker v. Burlington Northern, Inc., 587 P.2d 829, 831 (Idaho 1978) (internal citations omitted).

The court will address each claim of defamation against each defendant in turn.

> a.      The Teague Defendants

The Plaintiffs allege defamation against Defendants Patrick Teague and Steven Teague, who were State of Idaho employees at the time the relevant events occurred.  They were also members of the National Marine Corps League.  The Teagues contend, among other things, that all of their statements and actions challenged by the Plaintiffs occurred during the course and scope of their employment and so the Plaintiffs' defamation claims are barred by the Idaho Tort Claims Act[25] (the "Act").  But Plaintiffs say their claims are not barred by the ITCA because the Teagues were not acting within the scope of their employment when they allegedly defamed the Plaintiffs.

With the possible exception of two e-mails sent to Mr. Lindsey by Patrick Teague, the undisputed facts show that Patrick Teague and Steven Teague were acting within the course and scope of their employment with IDVS when they allegedly defamed the Plaintiffs.  Accordingly, the Act requires dismissal of the vast majority of Plaintiffs' defamation claims on that basis alone.  Specifically, Plaintiffs did not comply with the Act's mandatory requirement that notice of the defamation (tort) claims be filed with the Idaho Secretary of State within 180 days of the date the claims arose or reasonably should have been discovered.  Idaho Code Ann. § 6-905

---

[25]Idaho Code Ann. §§ 6-901 to 6-929.

(2009).[26]  Also, the Act protects employees with governmental immunity from libel or slander claims arising out of actions within the employee's course or scope of employment, if such actions were taken without malice or criminal intent.  Idaho Code Ann. § 6-904(3).[27]

Furthermore, the Plaintiffs' claims not covered by the Act fail on the merits either because Plaintiffs have not presented any admissible evidence to support their allegations or because the statements made by the Teague Defendants were true or constituted opinion.

     i.     *Actions Within the Course and Scope of Employment*

Plaintiffs contend that the following actions and statements by Patrick Teague defamed them:

- During the May 2005 conference, Patrick Teague told Mr. Lindsey (in front of other League members) that Mr. Swisher was guilty of fraud, blackmail, extortion and rape.

- From June 2005 through April 2006, Patrick Teague told other League members that Mr. Swisher is a pathological liar, extortionist and rapist.

- From August 2005 through April 2006, Patrick Teague told other League members that Mr. Lindsey a pathological liar and a stalker.

- On January 18, 2005, Patrick Teague told representatives of the VA that Mr. Swisher was a pathological liar and was guilty of fraud.

- From May through August 2005, Patrick Teague told representatives at the VA that Mr. Swisher was a pathological liar, blackmailer, extortionist and rapist.

---

[26]Idaho code section 6-905 directs that "all claims against an employee of the state for any act or omission of the employee within the course or scope of his employment shall be presented to and filed with the secretary of state within one hundred eighty (180) days from the date the claim arose or reasonably should have been discovered, whichever is later."

[27]Idaho code section 6-904(3) provides that state employees, "while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which . . . [a]rises out of . . . libel [or] slander . . . ."

(Second Am. Compl. Pt. 4 ¶¶ 104-05, 107, 110-11.)  They further contend that Steven Teague

defamed them as follows:

- During the May 2005 conference, Steven Teague told Mr. Lindsey (in front of other League members) that Mr. Swisher was guilty of fraud, blackmail, extortion and rape.

- In June 2005, Steven Teague told Mr. Lindsey that Mr. Swisher was a rapist, and had been convicted of fraud and extortion.

- From May 2005 through April 2006, Steven Teague told representatives of the VA that Mr. Swisher was guilty of fraud, extortion and rape.

- From May 2005 through April 2006, Steven Teague told League members that Plaintiffs were sociopaths and evil, that Mr. Swisher was a rapist and Mr. Lindsey was a stalker.

(Id. ¶¶ 113, 115-18.)

Plaintiffs essentially repeat the above-referenced conclusory allegations in their papers

opposing the Teague Defendants' motion for summary judgment.  But they do not produce any

admissible evidence.[28]  Their unsworn statements of fact, most of which do not provide

foundation for their statements and do not aver any personal knowledge, do not rebut the sworn

declarations of the Teague Defendants, who expressly deny making the alleged defamatory

statements.  Moreover, Plaintiffs present no evidence to rebut the conclusion that the vast

majority of statements and actions of the Teague Defendants occurred in the course of their

employment.

The Teague Defendants' attendance at the League conventions was consistent with their

---

[28]For example, Mr. Lindsey avers that in a declaration that "I have been informed by other Marine Corps League members that both Defendants, Steven Teague and Patrick Teague[,] have called me a liar and a stalker."  (Dkt # 236-2 at 2.)  This is inadmissible hearsay, even though contained in a sworn statement.

job responsibilities at the IDVS.  The fact that they also attended in their capacity as League members does not diminish the fact that they were there on official business.  And the fact that their attendance was outside the usual nine-to-five Monday-through-Friday workday is not sufficient to conclude they were not acting within the course or scope of their employment.  The evidence shows that their jobs often require them to work outside the normal working day environment.

The Act mandates that "it shall be a rebuttable presumption that any act or omission of an employee within the time and at the place of his employment is within the course and scope of his employment . . . ."  Idaho Code Ann. § 6-903(e).  All of the statements and acts listed above occurred "within the time and at the place" of the Teagues' employment.  And the Plaintiffs have not provided any evidence to rebut the presumption.

The court notes that the only statements in the record that could arguably fall outside the course and scope of the Teagues' employment with IDVS were the statements in Patrick Teague's emails to Mr. Lindsey.  But, as discussed below, the statements in those emails do not rise to the level of defamation.

ii.    *Governmental Immunity and Lack of Notice*

No one disputes the fact that the Teague Defendants were state employees at all relevant times.  And no one disputes that the Plaintiffs did not file any notice of their claims against the Teague Defendants with the Idaho Secretary of State.  Because the court finds as a matter of law that the alleged defamatory statements listed above were made within the course and scope of the Teague Defendants' employment with IDVS, the Plaintiffs' failure to file such notice is fatal to those claims.  See Idaho Code Ann. § 6-905;  McQuillen v. City of Ammon, 747 P.2d 741, 744

(Idaho 1987) ("Compliance with the Idaho Tort Claims Act's notice requirement is a mandatory condition precedent to bringing suit, the failure of which is fatal to a claim, no matter how legitimate."); Overman v. Klein, 654 P.2d 888, 890-91 (Idaho 1982) (dismissing defamation claims against state employees sued in their individual capacities because claimant failed to comply with the notice requirement).

Alternatively, Plaintiffs have not presented any evidence that any of the alleged defamatory statements were made with malice or criminal intent. Indeed, the Act requires the court to consider the rebuttable presumption that "any act or omission of an employee within the time and at the place of his employment is . . . without malice or criminal intent." Idaho Code Ann. § 6-903(e). Because Plaintiffs have not rebutted that presumption, the Teague Defendants are immune from liability for the Plaintiffs' claims of libel and slander under the Act's Section 6-904(3).

> iii.     *Defamation Claims Outside the Ambit of the Idaho Tort Claims Act*

To the extent the alleged defamatory statements were made outside the course and scope of the Teague Defendants' employment, Plaintiffs' claims fail on the merits because they have not produced any admissible evidence to support their conclusory allegations and the statements that can be proven were true or constitute opinion.

The only statements that would fall into this category are the two emails sent from Patrick Teague to Mr. Lindsey. The emails were sent from Mr. Teague's home email address. But nothing in them is defamatory (they either constitute opinion or are true), and the "files" forwarded to Mr. Lindsey were links to public websites. The Plaintiffs have not refuted this

evidence in any way.

For all the foregoing reasons, the Teague Defendants are entitled to summary judgment.

      b.    <u>The Idaho Observer Defendants</u>

          i.    *The Idaho Observer*

The only article allegedly published by The Idaho Observer is the April 2006 article.  But the undisputed record supports the conclusion that the article is not defamatory.  Because truth is a complete defense to a defamation claim, The Idaho Observer is entitled to summary judgment. (The court need not address the argument that the publication was privileged under Idaho law or that Mr. Swisher was a public figure.)

          ii.    *Don Harkins*

Don Harkins is Editor of The Idaho Observer.  The Plaintiffs do not provide any evidence that Mr. Harkins was the author of the article published in The Idaho Observer.  The mere fact that he is Editor of The Idaho Observer is not sufficient to find him liable for defamation. Moreover, there has been no evidence of wrongdoing on the part of the publication, so even if Mr. Harkins were somehow liable based on his status as Editor, there is no liability to impose. Accordingly, he is entitled to summary judgment.

          iii.    *Greg Towerton*

Greg Towerton, whose affiliation with this case is less than clear, was an employee of David Hinkson (the man accused in the "murder for hire" trial and the son of Defendant Roland Hinkson).  (Answer to Compl. (Dkt # 62) at p. 4.)  Mr. Swisher alleges in his brief[29] opposing the

---

[29]Nothing in the record suggests that Mr. Lindsey is accusing Mr. Towerton of defamation.

Idaho Observer Defendants' motion that, "on or around June 14, 2005, Defendant Towerton told a number of people that Plaintiff Swisher was a pathological liar and a rapist." (Mem. Opp'n (Dkt # 233) at 2.) Then Mr. Swisher generally alleges that Mr. Towerton slandered and libeled him. (See id.) But he does not provide any supporting evidence for his allegations against Mr. Towerton. Accordingly, Mr. Towerton is entitled to summary judgment, and the court hereby dismisses all defamation claims against him.

<em>iv.    Roland Hinkson</em>

Because there is no admissible evidence in the record against Roland Hinkson (as explained above), Plaintiffs have not sustained their burden. Accordingly, Mr. Hinkson is entitled to summary judgment.

c.    <u>Defendant Wesley Hoyt</u>

Wesley Holt is entitled to summary judgment because the statements attributed to him were true, not supported by admissible evidence, or fall within the court's ban on allegations concerning Mr. Swisher's testimony during the *Hinkson* trial.

d.    <u>The League Defendants</u>

The League Defendants include the League itself, as well as League members Mike Meade, Frank Kish, Vic Voltaggio, Dennis Dressler, Robert Gilmore, Duane Anderson, Michael A. Blum, Helen Hicks, Paul Hastings, Barry Georgopulos, David Lewis, Bill Snow, and Joseph Volk. The Plaintiffs allege defamation against all of the League Defendants. But they have not presented any admissible evidence of any defamatory statements made by the League or the individual League Defendants.

For example, Mr. Swisher states in conclusory fashion that "all of the foregoing

43

Defendants [certain League Defendants] have referred to Plaintiffs as an extortionist,

blackmailer, rapist and/or stalker."  (Second Am. Compl. Pt. 1 ¶ 37 (signed under penalty of

perjury); see also id. ¶ 62 ("In exparte conversations and emails, Defendant Mead[e] parroted

Defendants Hinkson and Volk's malicious message of Plaintiff Swisher's guilt of blackmail and

rape.  He also viciously stated that both Plaintiffs were sociopaths and evil and that Plaintiff

Lindsey was a stalker and should never have held an office in the Marine Corps League.").)

The vague and conclusory statements in their Second Amended Complaint (even though

signed under penalty of perjury) lack foundation and do not constitute evidence sufficient to

defeat summary judgment.  To survive summary judgment, evidence must be "more than purely

conclusory allegations . . . with no concrete relevant particulars."  Peterson v. Hewlett-Packard

Co., 358 F.3d 599, 603 (9th Cir. 2004) (internal citation and quotation marks omitted); see also

Thornhill Publ'g Co., Inc. v. General Tel. & Elec. Corp., 594 F.2d 730, 738 (9th Cir. 1979)

(conclusory and speculative affidavits do not establish genuine issue of material fact).  To the

extent that the Plaintiffs even point to any statement made by any of the League Defendants, their

allegations and conclusory statements have not materialized into actual proof.  Accordingly, the

League Defendants are entitled to summary judgment on the Plaintiffs' defamation claims.

**3.      Breach of Contract Claim Against the League**[30]

The League Bylaws and Administrative Procedures governed the April 1, 2006 League

---

[30]Plaintiffs do not point to any evidence or legal authority to support a claim of breach of
contract against the individual members of the League.  The contract (i.e., the League's By-Laws
and Administrative Procedures) is an agreement between the organization and the individual
member.  Accordingly, there is no claim for breach of contract against the individual League
Defendants.

hearing, the events preceding the hearing, and the subsequent disciplinary actions taken by the League.  The League is a private association, and the relationship between the League and its members is one of contract.  E.g.,  Garvey v. Seattle Tennis Club, 808 P.2d 1155, 1157 (Wash. Ct. App. 1991); see also Pollock v. Crestview Country Club Ass'n, 205 P.3d 1283, 1287 (Kan. Ct. App. 2009) ("Disputes between private social clubs and their members over expulsion do not engage constitutional due process protections, either substantive or procedural.").  The League's Bylaws and Administrative Procedures (hereinafter "Bylaws") are the contract,[31] and the court's judicial review authority is limited to whether the League followed its own procedures set forth in those bylaws and administrative procedures.  See, e.g., Garvey, 808 P.2d at 1157 ("When courts intervene in the internal affairs of a social club it is only to determine whether the club has violated its own rules."); Susi v. St. Andrews Country Club, 727 So.2d 1058, 1061 (Fla. Dist. Ct. App. 1999) (quoting Garvey for same proposition); Hartung v. Audubon Country Club, Inc., 785 S.W.2d 501, 503 (Ky. Ct. App. 1990) (same).  That is, the court may not review whether the suspension of Mr. Lindsey and expulsion of Mr. Swisher was a correct result (and neither Plaintiff appears to make such a claim).

The Bylaws provide that "[n]o member shall be deprived of any rights and privileges in the Marine Corps League  . . . unless the member shall first be charged, tried, and found guilty in accordance with the provisions of the National Bylaws and Administrative Procedures dealing with offenses and penalties."  (League Bylaws § 630 (referring to Chapter Nine).)  Plaintiffs contend that the League violated various provisions of the Bylaws' Chapter Nine.

---

[31]The Bylaws that were in effect at the relevant times are attached to Mr. Voltaggio's Declaration as Exhibit A.

Specifically, they contend that the League failed to provide proper notice of the charges and hearing (§§ 900(a), 900(f)(2), 900(j)(2)(a), 904(a)(1), 905), and that Judge Advocate Voltaggio violated the Bylaws when he temporarily suspended the Plaintiffs pending results of the hearing (see § 909).  They also allege a laundry list of less specific violations by vaguely referring to undisclosed "exparte contacts," "double jeopardy," investigator bias, hearing board bias, conflicts of interest, an "intentionally one sided" investigation, "an improper . . . hearing," a conviction "on charges that differ substantially from the non-specific charges received via mail," failure to make settlement attempts, failure to inform and include the Department of Idaho Marine Corps League in the National League's actions concerning the Plaintiffs, a hearing with a "short improper time frame," premature conclusion of Plaintiffs' guilt before the hearing was held, and lack of jurisdiction.  (E.g., Second Am. Compl. Pt. 1 ¶¶ 3, 7, 10, 11, 13-14, 20-21.)

> a.   Notice Provisions of the Bylaws

The Bylaws require that the offenses with which the Plaintiffs were charged under Section 912 "must be processed in accordance with the applicable section or sections of Chapter Nine." (§ 912.)

To begin, the Bylaws require that "[a]ll correspondence required by Chapter Nine, Administrative Procedures, will be certified mail and return receipt requested." (Bylaws § 900(i).)

Concerning specific notice requirements, the Bylaws provide for various types of notices and deadlines for such notices.  First,

> [t]he Jurisdictional Judge Advocate must notify the Petitioner and Respondent of the members appointed to the Hearing Board no less than twenty (20) days prior to the convening date of the Board.  The Petitioner and Respondent will have ten

46

(10) days to object to any or all of the appointed Board Members with the exception of the Jurisdictional Judge Advocate. . . .  <u>Potential Hearing Board Members who may have a conflict of interest</u> through friendship, marriage, family relationship or prejudice <u>must recuse themselves</u> from sitting on the Hearing Board.

(§ 900(a) (emphasis added).)  Also, "the Jurisdictional Judge Advocate will <u>distribute the depositions and exhibits to the Petitioner and Respondent seven (7) days prior to the date the Hearing Board convenes</u>" (§ 900(j)(2)(a) (emphasis added)) and the "Chair [of the Hearing Board] will provide the Petitioner and the Respondent with a <u>list of all invited witnesses five (5) days prior to the convening of the Hearing Board</u>." (§ 900(f)(2) (emphasis added).)  And finally,

[w]henever an individual member [or] Detachment Officer . . . commits an act contrary to the [Bylaws], or an act which is deemed not in the best interest of the Marine Corps League, said individual member [or] Detachment Officer . . . shall be charged as follows: (1) <u>A charge, in writing, shall be served upon the offender (Respondent)</u>, with copies to the Department Commandant and the Department Judge Advocate, the National Commandant and the National Judge Advocate.

(§ 904(a)(1) (emphasis added).)[32]

       b.    <u>Temporary Suspension Provision</u>

The Jurisdictional Judge Advocate (in this case, Mr. Voltaggio), "[i]n all proceedings brought under Sections 904, 905, 906, and 907 herein, . . . shall possess the discretionary authority to temporarily suspend from membership, office or function, the Respondent, pending

---

[32]Curiously, at the end of the text of the Bylaws' Chapter Nine, a "footnote" printed "for information purposes only and [which] is not part of the [Bylaws]" provides that:

"Charges" preferred under this Chapter shall not be by reference to a section, they shall also specify: **What was to have occurred, when it was to have occurred, and such other supporting information** as necessary to adequately inform the Respondent so a defense may be prepared.

(Dkt # 225-7 at p. AP 9-13 (emphasis added and emphasis in original).)

final resolution of the charge." (§ 909.)

         c.     <u>The League Substantially Complied With Its Procedures.</u>

First, the court finds that the Plaintiffs' claim that Mr. Voltaggio improperly suspended

them on a temporary basis pending resolution of the issues set for hearing is without merit.

Clearly Mr. Voltaggio had the discretionary authority to do what he did. (<u>See</u> <u>id.</u>)

Second, the court finds that the League substantially complied with the relevant Bylaws

notice requirements for the reasons set forth below.

All of the correspondence was sent certified mail return receipt requested. Mr.

Voltaggio's February 22, 2006 letters to Mr. Swisher and Mr. Lindsey were sent thirty-seven

days before the scheduled April 1, 2006 hearing. Those letters clearly listed the names of the

appointed members of the Hearing Board and clearly listed the date and time of the hearing. The

charges were listed, and the Bylaws do not require more than that. In the letter to Mr. Lindsey,

Mr. Voltaggio (although not required by the Bylaws) elaborated on the facts underlying the

charges against Mr. Lindsey.

In the letter to Mr. Swisher, Mr. Voltaggio identified the names of the petitioners who

had filed grievances against Mr. Swisher. (Contrary to Mr. Swisher's contention, the Bylaws do

not require that a copy of the grievance be given to the Respondent.) And more than five days

before the hearing, Mr. Voltaggio sent a list of witnesses who were invited to testify in the case

against Mr. Swisher.[33] The fact that Mr. Swisher received the letters less than five, or twenty,

---

      [33]The record does not contain any evidence showing whether depositions and other
exhibits (assuming they existed) were provided to the Plaintiffs seven days before the hearing.
(<u>See</u> Bylaws § 900(j)(2)(a).) Accordingly, the court cannot find that a violation of that provision
occurred. Similarly, there is no evidence of actual conflicts of interest that would require a

days before the hearing seems irrelevant.  The Bylaws do not state that actual notice is required within the designated time frame.

Also, Plaintiffs' argument that the National Judge Advocate and the National Hearing Board lacked jurisdiction is not well taken.  They do not point to anything in the Bylaws that would support their position.  See also Brooks v. Petroleum Club of Wichita, 484 P.2d 1026, 1029 (Kan. 1971) ("Where a member of a voluntary organization voluntarily appears before a committee or board, constituted for the purpose of hearing a dispute as to his membership, he is estopped from denying jurisdiction with respect to either person or subject matter.").

Finally, the procedures during the hearing appear to have been fair.  During the hearing, both Mr. Lindsey and Mr. Swisher were permitted to call witnesses, review and respond to the evidence of the charges against them, and to present arguments regarding their defenses to the charges.  Both of them were represented by advocates during the hearing.  The hearing regarding Mr. Lindsey lasted more than four hours.  (See Apr. 1, 2006 Hr'g Tr. at 183 (attached as Ex. I to Voltaggio Decl.).)  The hearing regarding Mr. Swisher lasted approximately four hours. (Voltaggio Decl. ¶ 20.)  All of this suggests that Mr. Swisher's allegation of a "kangaroo court" is simply not accurate.

As for the other vague contentions in the Plaintiffs' "laundry list" of violations, the evidence in the record is simply is not sufficient to explain or support them.

For all the foregoing reasons, the court finds that the League did not violate its Bylaws and so is not liable to the Plaintiffs for breach of contract.

---

Hearing Board member to recuse, so the court cannot make a finding about whether that portion of the Bylaws (§ 900(a)) was violated.

**ORDER**

For the foregoing reasons, the court ORDERS as follows:

1.      The Federal Agency Defendants' Motion for Summary Judgment on the Privacy Act claims (Dkt # 200) is GRANTED.

2.      The Motion for Summary Judgment filed by Defendants Patrick Teague and Steven Teague (Dkt #  222) is GRANTED.

3.      Defendant Wesley Hoyt's Motion for Summary Judgment on the defamation claim against him (Dkt # 215) is GRANTED.

4.      The Idaho Observer Defendants' Motion for Summary Judgment (Dkt # 220) is GRANTED.

5.      The National Marine Corps League Defendants' Motion for Summary Judgment (Dkt # 225) (in which the Teague Defendants join (Dkt # 227)) is GRANTED.

6.      The Plaintiffs' five Motions to Deny the summary judgment motions of the remaining Defendants (Dkt #s 209, 228, 232, 235, and 241) are DENIED.

DATED this 11th day of June, 2009.

BY THE COURT:

TENA CAMPBELL
District Court Judge